**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| North County Communications Corporation of Arizona, a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Qwest Corporation dba Century Link QC, a Colorado corporation, et al.,<br><br>Defendants. | No. CV-13-00466-PHX-DGC<br><br>**ORDER** |

Plaintiff North County Communications Corporation ("North County") has filed a complaint seeking declaratory judgment and injunctive relief. Doc. 1. North County has moved for summary judgment. Doc. 35. Defendants Qwest Corporation ("Qwest") and the Arizona Corporation Commission (the "ACC") have filed cross-motions for summary judgment. Docs. 37, 46. The motions are fully briefed and oral argument was held on December 6, 2013. For the reasons that follow, the Court will enter summary judgment for Defendants.

**I.     Background.**

Congress enacted the Federal Telecommunications Act of 1996 (the "Act") "to deregulate the telecommunications industry and spur competition." *Quick Commc'ns, Inc. v. Mich. Bell Tel. Co.*, 515 F.3d 581, 583 (6th Cir. 2008); *see* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ("An Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers[.]"). The Act "requires telephone companies

competing within the same area to 'interconnect' their networks" so that customers can receive calls from and place calls to customers using different telephone service providers. *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*, 235 F.3d 493, 495 (10th Cir. 2000). The Act distinguishes between two types of service providers: Incumbent Local Exchange Carriers ("ILECs") and Competitive Local Exchange Carriers ("CLECs"). ILECs are entities such as Qwest that previously "held a monopoly on local telephone service" in a particular area. *Quick Commc'ns*, 515 F.3d at 583. CLECs are entities such as North County that seek to interconnect with ILECs. ILECs and CLECs interconnect by entering into an interconnection agreement ("ICA"), which governs the terms under which their networks are connected. *Sw. Bell*, 235 F.3d at 495.

Section 252(a)(1) of the Act directs telephone carriers to negotiate ICAs. If negotiations are not successful, the parties may ask the local state utility commission "to participate in the negotiation and to mediate any differences arising in the course of negotiation." 47 U.S.C. § 252(a)(2). Alternatively, either party "may petition a State commission to arbitrate any open issues." *Id.* § 252(b)(1). All ICAs, whether adopted by negotiation, mediation, or arbitration, must be "submitted for approval to the State commission," which "shall approve or reject the agreement." 47 U.S.C. § 252(e)(1).

North County and Qwest entered into an ICA in 1997. Doc. 35 at 1. The 1997 ICA has been amended several times to reflect changes in telecommunications laws. *Id.* at 2. Section XXXIV, ¶ V of the 1997 ICA provides that the ICA will be effective for a period of 2.5 years, and thereafter "shall continue in force and effect unless and until a new agreement . . . becomes effective between the Parties." Pursuant to this clause, Qwest requested to negotiate a new agreement with North County in 2008. Doc. 1-1, ¶ 35. On August 3, 2009, after more than a year of negotiations, Qwest filed a petition for arbitration with the ACC. *Id.*, ¶ 1. The parties engaged in a lengthy arbitration process (*id.*, ¶¶ 2-31), which culminated with the ACC issuing a decision on July 25, 2011 (Doc. 35 at 4). The decision approved a new ICA (the "2011 ICA") based on the results of an arbitration hearing. *See* Doc. 23-3.

North County challenges the validity of the 2011 ICA.  North County argues that the ACC did not have authority to arbitrate the parties' dispute (*id.* at 5-6) and that several provisions of the 2011 ICA are contrary to law (Doc. 35 at 6-14).  Defendants counter that the ACC had full authority to arbitrate the 2011 ICA and that all challenged provisions are consistent with law and supported by substantial evidence.  Docs. 37, 46.

The Court reviews *de novo* whether the ACC's decision is consistent with the Act and implementing regulations, and reviews all other issues under an arbitrary and capricious standard.  *Pacific West v. Pac West Telecomm, Inc.*, 325 F.3d 1114, 1123 n.8 (9th Cir. 2003).

## II.     Validity of the Arbitration.

North County asks the Court to declare the 2011 ICA "void *ab initio*" because "it was achieved in a manner that flatly contradicts the Act."  Doc. 35 at 6.  North County argues that the Act "neither contemplates nor permits" the situation that occurred here, namely an ILEC requesting negotiation with a CLEC.  *Id.* at 5.  North County argues that the Act's negotiation and arbitration provisions – sections 252(a)(1) and (b)(1) – apply only to situations where a CLEC like North County has requested interconnection with an ILEC like Qwest.  Because the opposite occurred here – Qwest requested renegotiation of the 1997 ICA – North County contends that the Act does not apply and arbitration by the ACC was invalid.  *Id.* at 5.  No court has directly considered whether the language of sections 252(a)(1) and (b)(1) applies to requests to negotiate made by ILECs to CLECs.  The Court must therefore look to the statute for guidance.

The Court's task in construing the Act is to determine Congress's intent, beginning with the language of the statute.  *Chubb Custom Ins. Co. v. Space Systems/ Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (internal citation omitted).  The Court will not, however, follow "a literal interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result."  *Id.*

### A.     Language of the Act.

Section 252 of the Act is titled "Procedures for negotiation, arbitration, and

1    approval of agreements." 47 U.S.C. § 252. No other section of the Act purports to
2    establish procedures for negotiating and arbitrating ICAs. Section 252(a)(1), which
3    concerns negotiations, provides that "*[u]pon receiving a request for interconnection,*
4    *services or network elements pursuant to section 251 of this title*, an [ILEC] may
5    negotiate and enter into a binding agreement with the requesting telecommunications
6    carrier or carriers[.]" 47 U.S.C. § 252(a)(1) (emphasis added). Section 252(b)(1), which
7    concerns arbitration of ICA disputes by state commissions, provides that "[d]uring the
8    period from the 135th to the 160th day (inclusive) *after the date on which an [ILEC]*
9    *receives a request for negotiation under this section*, the carrier or any other party to the
10   negotiation may petition a State commission to arbitrate any open issues." 47 U.S.C.
11   § 252(b)(1) (emphasis added). The emphasized language in both sections refers only to
12   situations where an ILEC receives a request for interconnection or negotiation. The
13   language does not mention requests for negotiations initiated by an ILEC or mutually
14   agreed upon by an ILEC and CLEC. North County relies on this language to argue that
15   the Qwest-initiated negotiations in this case did not trigger section 252, and that the
16   ACC's arbitration of the 2011 ICA was therefore invalid.

17          Dicta in several cases reflect the limited nature of the language emphasized above.
18   *See, e.g.*, *AT&T v. Pac-West Telecomm, Inc.*, 651 F.3d 980, 983 n.3 (9th Cir. 2011)
19   ("[a]lthough all carriers have the duty to interconnect and the duty to establish reciprocal
20   compensation arrangements, *only* ILECs have the statutory duty to *negotiate* an
21   interconnection agreement in good faith, . . . , and *only* ILECs can be required to arbitrate
22   an interconnection agreement if good-faith negotiations do not result in an
23   agreement[.]"); *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1117 (9th Cir. 2009)
24   (noting that "[a] state commission may only arbitrate issues after an ILEC receives a
25   request for negotiation 'pursuant to section 251,'" and that "all state commission
26   arbitration authority under Section 252 is inextricably tied to the duties imposed under
27   Section 251[.]"); *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1190-91 (9th Cir.
28   2008) ("The 1996 Act sets out a procedural framework for these negotiations: First, a

requesting carrier must make a request for interconnection to an incumbent carrier, which 'may negotiate and enter into a binding agreement with the requesting . . . carrier . . . without regard' to the substantive standards of § 251."); *Core Commc'ns, Inc. v. Verizon Pa., Inc.*, 493 F.3d 333, 336 (3d Cir. 2007) ("The process commences when an ILEC receives a 'request for interconnection' from another telecommunications company. . . . The Act then requires the ILEC to 'negotiate in good faith in accordance with section 252[.]'"); *Qwest Corp. v. Public Utilities Comm'n of Colo.*, 479 F.3d 1184, 1187 (10th Cir. 2007) (stating that section 252 "provides that an ILEC faced with a request for interconnection may either negotiate an agreement with the requesting party or submit to arbitration[.]"); *Indiana Bell Tel. Co. v. McCarty*, 362 F.3d 378 (7th Cir. 2004) (stating that the Act "requires incumbents to negotiate an agreement . . . with new entrants at their request"); *Coserv. Ltd. Liability Corp. v. Sw. Bell Tel. Co.*, 350 F.3d 482, 487 (5th Cir. 2003) ("[C]ompulsory arbitration under § 252 begins with a request by a CLEC to negotiate with an ILEC regarding its obligations under § 251."); *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 726-27 (1999) ("When an entrant seeks access through any of these routes, the incumbent can negotiate an agreement[.]").

Although the language in these cases reflects the literal wording of sections 252(a)(1) and (b)(1), none of the cases considers whether the mediation and arbitration provisions in section 252 are limited to negotiations that commence with a request directed to an ILEC. To resolve this question, the Court must consider whether a literal reading of 252(a)(1) and (b)(1) comports with the statutory scheme and congressional intent. *Chubb Custom*, 719 F.3d at 958.

### B.     Intent of the Act.

A review of the Act reveals two congressional objectives that are relevant to the issue presented in this case. First, Congress sought to encourage competition in the telecommunications industry by requiring the good faith negotiation of ICAs by ILECs and CLECs. Second, Congress placed state utility commission in the central role of mediating and arbitrating disputes that arise in the negotiations, and of approving ICAs.

1    The first objective is evident from the Act's approach to achieving competition. Congress did not dictate the precise manner in which telecommunications carriers must interconnect. Instead, it imposed a duty on all carriers to interconnect (47 U.S.C. § 251(a)(1)), and designated ICAs as the vehicle to facilitate this interconnection. The Act established a process whereby established carriers in a particular location (ILECs) must share their networks with other carriers that wish to transmit into or receive calls from the ILEC's area (CLECs). The Act identifies general principles that must be satisfied in the ICAs (§ 251(c)(2)-(6)) and imposes duties of good faith negotiation on both ILECs and CLECs. The Act states that each ILEC has a "duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements," and that each CLEC "also has the duty to negotiate in good faith the terms and conditions of such agreements." 47 U.S.C. § 251(c)(1)).

The second objective is apparent from the role accorded state commissions in the Act. Although Congress invested the Federal Communications Commission ("FCC") with rulemaking and other regulatory authority under the Act (47 U.S.C. § 251(d), (3)), it placed state utility commissions in charge of mediating, arbitrating, and approving individual ICAs (*id.*, § 252). In addition to designating state commissions as the bodies to mediate and arbitrate ICAs, section 252 mandates that "[a]ny interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission." 47 U.S.C. § 252(e)(1).

Numerous cases have recognized that Congress intended state commissions to play a central role in the negotiation and approval of ICAs. The Ninth Circuit has noted that state commissions "must ensure that [an] ICA meets the requirements of Sections 251 and 252 of the Act, and must establish 'just,' 'reasonable,' and 'nondiscriminatory' rates for services and a schedule for implementation." *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 973-74 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 758 (2012) (*W. Radio II*). Other circuits have also recognized the central role of state commissions under the Act. *See*, *e.g.*, *Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 368 (4th Cir.

2004) ("When Congress brought the regulation of competition in local telephone markets under federal control in the 1996 Act, it could have placed regulatory authority exclusively with the FCC. But Congress chose a different course, giving states the option to participate in the federally prescribed regulatory scheme."); *BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1277 (11th Cir. 2003) ("[T]he language of § 252 persuades us that in granting to [state commissions] the power to approve or reject [ICAs], Congress intended to include the power to interpret and enforce in the first instance[.]"); *Coserv Ltd.*, 350 F.3d at 487 (noting that "*any issue* left open after unsuccessful negotiation [of an ICA] would be subject to arbitration by the [state commission]") (emphasis in original).

Any interpretation of sections 252(a)(1) and (b)(1) must be consistent with these two basic objectives of the Act: encouraging competition through the good faith negotiation of ICAs by ILECs and CLECs, and placing state commission in the central role of mediating, arbitrating, and approving ICAs. The Court concludes that North County's strict reading of sections 252(a)(1) and (b)(1) would be inconsistent with these objectives.

As noted above, section 252 contains the only procedures in the Act governing the negotiation, mediation, and arbitration of ICAs. If section 252 were held to apply only when an ILEC "receiv[es] a request for interconnection, services or network elements" (§ 252(a)(1)) and not in other circumstances – such as when negotiation of an ICA is initiated by an ILEC or by mutual agreement of an ILEC and CLEC – then a potentially significant number of negotiations, disputes, and ICAs would fall outside the negotiation and mediation provisions of section 251(a)(1) and the arbitration provisions of section 251(b)(1). What is more, approval of such ICAs by state commissions would not be required because section 251(e) applies only to an ICA "adopted by negotiation or arbitration," a clear reference to the negotiation and arbitration provisions of sections 252(a)(1) and (b)(1). *See* § 252(e)(2)(A) and (B) (limiting state commission rejection to ICAs "adopted by negotiation under subsection (a)" or "adopted by arbitration under

subsection(b)"). Thus, North County's strict reading of the language in section 252(a)(1) and (b)(1) would result in a class of negotiations and ICAs that are not governed by the Act and its various provisions concerning negotiation, and not subject to mediation, arbitration, or approval by a state commission. Such a result would conflict with Congress's intent to regulate negotiations through specific principles that must be included in ICAs and the duty of good faith negotiation. It would also conflict with Congress's clear intent to place state commissions in the role of mediating, arbitrating, and negotiating ICAs.

The 1997 ICA between North County and Qwest provides an apt example. As noted above, the 1997 ICA had an agreed-upon life of only 2.5 years, after which it would "continue in force and effect unless and until a new agreement . . . becomes effective between the Parties." Doc. 35, § XXXIV, ¶ V. The ICA clearly contemplated the negotiation of a "new agreement" between North County and Qwest, and North County acknowledges that the 1997 ICA has, in fact, been renegotiated on several occasions to accommodate changes in the law. Under North County's strict reading of the statute, however, any new or amended ICA could be reviewed and approved by the ACC only if North County requested the renegotiation.[1] If Qwest requested the renegotiation, or if the parties mutually agreed to negotiate, section 252 would not apply, ACC mediation and arbitration would not be available, and ACC approval of the new agreement could not be required. The purposes of the Act would be frustrated.

North County responds to this conundrum with an equally unsatisfying alternative. It argues that there is no class of negotiations or ICAs that fall outside the scope of section 252 because the negotiation of an ICA can never be initiated by an ILEC. North County asserts that the 1997 ICA, for example, can never be renegotiated at the request of Qwest or, by implication, upon mutual agreement of Qwest and North County – it can

---

[1] In fact, a truly strict reading of section 252(a)(1) would not allow ACC review of an ICA negotiated at the request of North County unless that request coincided with the literal language of the section – "a request for interconnection, services or network elements pursuant to section 251." 47 U.S.C. § 252(a)(1).

be renegotiated only at the request of North County. Under this reading, Qwest would be forced to live with the 1997 ICA no matter how outdated or unfair it became, waiting for a time when North County saw fit to request renegotiation. North County suggests that Qwest would have one alternative under this reading of the law – it could terminate the ICA. But the Court cannot conclude that limiting ILECs to such an alternative accords with the objective of the Act to encourage interconnection and good faith negotiation of ICAs between ILECs and CLECs. Nor is it consistent with the 1997 ICA's express contemplation of a "new agreement."

The Court concludes that North County's literal reading of section 252(a)(1) and (b)(1) does not comport with the purposes of the Act – to encourage interconnection, to require both ILECs and CLECs to negotiate in good faith, and to vest state commissions with the power to mediate, arbitrate, and ultimately approve ICAs. Because the Court cannot adopt "a literal interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result," *Chubb Custom Ins.*, 710 F.3d at 958, it must reject North County's proposed interpretation. The most reasonable construction is that section 252 applies to any negotiation of an ICA between an ILEC and CLEC, regardless of which party initiates the discussions. Such a reading avoids an interpretation that defeats major purposes of the Act and that places ILECs in the untenable position of having to terminate existing ICAs rather than requesting to renegotiate them. It also preserves for state commissions the critical mediation, arbitration, and approval roles intended by Congress.

The FCC agrees with this conclusion. It has stated that "[a]lthough section 252(a)(1) and section 252(b)(1) refer to requests that are made *to* incumbent LECs, we find that in the interconnection amendment context, either the incumbent or the competitive LEC may make such a request, consistent with the parties' duty to negotiate in good faith pursuant to section 251(c)(1)." *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978, 2003 WL 22175730, at ¶ 703 n. 2087 (2003) (emphasis in original). Defendants argue

that the Court must defer to this FCC conclusion under *Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984). The Court is not certain that such deference is warranted when the agency's conclusion is limited to a footnote of an agency decision, *see Gila River Indian Cmty v. United States*, 729 F.3d 1139, 1150 (9th Cir. 2013), *as amended* (July 9, 2013), but the FCC's view is instructive, and it supports the Court's statutory interpretation.

One final point is worth mentioning. North County voluntarily entered into the 1997 ICA with its limited life of 2.5 years and its contemplation of a "new agreement" with Qwest. North County and Qwest modified the 1997 ICA on several occasions with no apparent claim from North County that Qwest's only option was to terminate the agreement. North County responded to Qwest's request to negotiate the 2011 ICA and participated in lengthy and detailed negotiations. And North County waited nearly two years after the ACC approved the 2011 ICA before bringing this action challenging the ACC's jurisdiction. This history significantly undermines North County's current claim that the entire renegotiation process was invalid.

In summary, the Act applies even when an ILEC requests renegotiation of an ICA. The ACC therefore had authority to arbitrate the parties' differences and approve the 2011 ICA, and the Court will not set aside the agreement as void.

**III.   Challenges to Specific Portions of the 2011 ICA.**

    **A.   Sections 7.3.1.1.3.1 and 7.3.2.2.1.**

North County contends that sections 7.3.1.1.3.1 and 7.3.2.2.1 of the 2011 ICA violate federal law. North County argues that federal law prohibits any ILEC from assessing charges on any other telecommunications carrier for traffic that originates on the ILEC's network. Doc. 35 at 6. It argues that section 7.3.1.1.3.1 of the 2011 ICA conflicts with this principle because it "imposes" a relative use factor ("RUF") of 50 percent and "requires [North County] to share the cost of 'LIS two-way entrance facilities.'" *Id.* at 7. It also contends that section 7.3.2.2.1 is contrary to law because it

1  applies the same RUF assumptions to two-way DTT facilities.[2]  *Id.*  This argument is
2  clearly incorrect because the ACC did not approve a 50/50 RUF in the 2011 ICA.  It
3  adopted a RUF of 99 to 1.  Doc. 23-3, ¶ 93.

4  In its reply brief, North County acknowledges the 99 to 1 ratio and argues that it is
5  still unlawful because 100 percent of the traffic originates on Qwest's network.  Doc. 41
6  at 4.  The record from proceedings before the ACC, however, contains evidence showing
7  that although Qwest originates nearly all of the traffic, North County does originate
8  some.  *See* Doc. 26 at 140-41.  Given this evidence, the ACC's adoption of a 99 to 1 RUF
9  was not arbitrary and capricious.

10  **B.    Sections 7.1.1 and 7.2.1.1.**

11  North County argues that the language of 7.1.1 and 7.2.1.1 of the 2011 ICA
12  violates section 252(i) of the Act, which requires ILECs to "make available any
13  interconnection, service, or network element provided under an agreement approved
14  under this section to which it is a party to any other requesting telecommunications
15  carrier upon the same terms and conditions as those provided in the agreement."  Doc. 35
16  at 8.  North County uses multi-frequency ("MF") signaling technology, an older
17  technology than the SS7 technology used by Qwest.  Section 7.1.1 provides that in the
18  event North County wishes to start originating traffic to send to Qwest, the parties will
19  negotiate an amendment to the ICA "which will also include requirements for use of SS7
20  signaling in the mutual exchange of traffic."  North County claims that "[o]ther carriers
21  in Arizona operate under ICAs that do not prohibit MF signaling for outbound calls" and
22  argues that it entitled to the same accommodation under section 252(i).  Doc. 35 at 8.
23  North County also claims that Qwest has the ability to program its switches to
24  accommodate both MF and SS7 signaling and simply does not want to accommodate
25  North County's needs.  *Id*.

26  Qwest contends that other carriers use MF signaling only for certain types of

---

28  [2] North County does not define the acronyms "LIS" and "DTT," and the Court does not know what they mean.

- 11 -

1  traffic, such as emergency or long-distance calls, for which SS7 signaling is not needed,
2  and that North County's argument centers on the interconnection of local telephone
3  traffic.  Doc. 37 at 12.  Qwest further contends that if North County were to originate
4  calls using MF signaling, Qwest would be unable to determine the proper jurisdiction of
5  the calls, leading to problems with tracking and billing.  *Id.*

6  North County conceded at oral argument that section 252(i) does not allow it to
7  "pick and choose" provisions from other ICAs, but rather allows a CLEC to opt-in to an
8  entire ICA of another CLEC.  Because North County does not seek such a wholesale
9  adoption of another ICA, section 252(i) does not apply here.

10  The ACC nonetheless must ensure that an arbitrated ICA is consistent with the
11  requirements of section 251, including the duty of an ILEC to provide interconnection
12  "on rates, terms and conditions that are just, reasonable, and nondiscriminatory."  47
13  U.S.C. § 251(c)(2)(D).  North County has failed to show, however, that sections 7.1.1 and
14  7.2.1.1 of the 2011 ICA are unfair or discriminatory, and points to no evidence in the
15  record that would support this assertion.  To the contrary, there is evidence in the record
16  of problems related to MF signaling (Doc. 21-3 at 18-21), and that CLECs that use MF
17  signaling in Arizona do so only for "ancillary services" (Doc. 26-1 at 93).  The Court
18  accordingly finds that the ACC's decision on this point was not arbitrary and capricious.

19  **C.   Section 7.6.**

20  North County's issue with section 7.6 was neither raised before the ACC nor
21  discussed in its order.  The Court will therefore not consider the issue.  *See W. Radio II*,
22  678 F.3d at 979.

23  **D.   Section 7.8.**

24  North County argues that the 400,000 minute cap in section 7.8.1.2 of the 2011
25  ICA is "completely arbitrary and completely prejudicial and therefore illegal and against
26  public policy."  Doc. 35 at 12.  But North County does not cite authority or evidence
27  demonstrating why this section is arbitrary or prejudicial.  It instead asserts that Qwest
28  "simply pulled an arbitrarily low number out of the air and called it an accommodation."

*Id.* at 11. North County claims that Qwest "makes no similar deduction from any other CLEC's invoices," and that Qwest's inability to track usage from North County's network is a "fabrication." *Id.* at 11-12. It contends that Qwest could "provide the automatic number identification information to North County and North County could determine the billable minutes," and that other ILECs provide such information to North County. *Id.* at 12.

Qwest contends that the ACC's approval of a 400,000 minute cap is supported by substantial evidence. Doc. 37 at 17. Qwest points to evidence in the record that North County's use of MF signaling "has caused dozens of billing disputes" and resulted in overpayment. *Id.*, citing Doc. 27-3 at 11-12. Qwest notes that the ACC found the cap of 400,000 minutes to be reasonable and necessary to "limit Qwest's exposure to paying for traffic that is not compensable." Doc. 37 at 18, citing Doc. 23-3 at 16-18. Qwest also disputes North County's contention that it would be easy for Qwest to track MF calls, and argues that evidence presented to the ACC showed that such an action would be a "massive undertaking." Doc. 37 at 18, citing Doc. 27-4 at 8; Doc. 26-1 at 41.

The ACC contends that its decision was supported by the testimony of Qwest witness Renee Albersheim. Doc. 46 at 17. The ACC also notes that the language of section 7.8 allows "either party to request a modification of the cap, including its elimination, based on verifiably accurate records[.]" *Id.*; Doc. 23-3 at 18, ¶ 76. The ACC further notes that the cap was intended as a safeguard because certain kinds of traffic are not subject to precise tracking and the cap "was based on historic traffic levels between the parties." Doc. 46 at 18. The ACC also argues that the cap is not discriminatory because "there is no other CLEC that uses MF signaling for interconnection." *Id.*, citing Doc. 27-3 at 21.

The ACC's decision is supported by substantial evidence and is not arbitrary and capricious. Evidence in the record shows past billing disputes between the parties and confirms the difficulty of tracking calls using MF signaling. Additionally, the cap approved by the ACC is based on historic traffic levels between the parties and is subject

to modification if warranted. The ACC's approval of the cap was not arbitrary and capricious.

### E. Voice Internet Protocol Technology.

North County contends that it sought to include voice internet protocol ("VoIP") in the 2011 ICA, but that Qwest refused to engage in this discussion. Doc. 35 at 13. North County further contends that Qwest provides VoIP to its customers. *Id.* North County again argues that this violates section 252(i) of the Act, citing *W. Radio Servs. Co. v. Qwest Corp.*, 734 F. Supp. 2d. 1139, 1151 (D. Or. 2010), for the proposition that "ILECs are required to provide interconnection to requesting carriers 'that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection[.]'"

Qwest argues that it does not provide VoIP service, but rather that one of its "corporate affiliates" does, and that North County therefore is demanding a service which Qwest does not offer. Doc. 37 at 20, citing Doc. 26-1 at 45-46. Qwest notes that North County does not cite anything in the Act or any implementing provisions that would require Qwest to offer VoIP interconnection. Doc. 37 at 20.

The ACC notes that testimony at the arbitration hearing established that Qwest does not offer VoIP service. Doc. 46 at 18, citing Doc. 26 at 45. Additionally, VoIP is not a "signaling technology" and is not comparable to SS7. Doc. 46 at 19, citing Doc. 26 at 46.

Evidence at the hearing established that Qwest does not offer VoIP service. Although Qwest's corporate affiliate may provide such services, Qwest itself does not. Because Qwest is the ILEC involved in this litigation, it was not arbitrary and capricious for the ACC to determine that Qwest was not required to provide a service to North County that it does not offer to its customers or other CLECs.

### F. Third-Party Tandem Providers.

North County contends that Qwest has refused to agree to transmit its traffic to North County via third-party tandem providers and that Qwest is thereby attempting to

"block" traffic from reaching North County's network. Doc. 35 at 16. North County does not offer support for its assertion that Qwest is attempting to block traffic or that Qwest should be required to exchange traffic through third-party providers. The ACC states that North County did not provide any proposed ICA language or "sufficient evidence to support a finding that [third-party] interconnection is appropriate at this time." Doc. 46 at 19. The ACC also notes that the language of the 2011 ICA allows North County to request an amendment allowing third-party transit providers.

The ACC's decision here was not arbitrary and capricious. North County has not identified evidence in the record supporting its position and therefore has not shown that the ACC acted arbitrarily and capriciously on this issue.

**IT IS ORDERED:**

1. Qwest and the ACC's cross-motions for summary judgment (Docs. 37, 46) are **granted.**

2. North County's motion for summary judgment (Doc. 35) is **denied**.

3. The Clerk shall terminate this action.

Dated this 23rd day of December, 2013.

_____
David G. Campbell
United States District Judge